[L. A. No. 8549. In Bank.—June 27, 1927.]

JOHN FRANKLIN JOHNSON, as Superintendent of
Banks, etc., in Charge of Liquidation of FARMERS
AND MERCHANTS STATE BANK OF CHINO, Re-
spondent, v. S. J. ULREY, Appellant.

[1] PROMISSORY NOTES—WANT OF CONSIDERATION—FRAUD—INSUFFI-
CIENCY OF EVIDENCE.—In this action upon a promissory note exe-
cuted and delivered to a bank to procure funds to purchase cer-
tain stock, in which the defendant plead want of consideration
and conspiracy to defraud, it is held that the evidence, taken as
a whole, was not sufficient to justify a jury in drawing an in-
ference that the cashier of the bank conspired with certain other
parties to defraud the defendant or that he had any knowledge
of their unlawful scheme.

[2] ID.—EVIDENCE—BAD BUSINESS PRACTICE—OTHER TRANSACTIONS.—
In such an action, evidence offered to show that the bank, in
other transactions between it and persons among whom was one
of the parties charged with the fraud in this action, had issued
certificates of deposit in payment of promissory notes received
by it out of all proportion to the capitalization of the bank and
not in conformity with good banking practices, was not admissible
as a circumstance tending to prove a conspiracy to defraud the
defendant in this case and was properly excluded.

[3] ID.—WITNESSES—IMPEACHMENT—REFUSAL TO OPEN DEPOSITION—
LACK OF PREJUDICE.—In such a case, where the cashier of the
bank testified that he had heard of the appellant before he was
introduced to him by one of the parties charged with the fraud,
the refusal of the court to order opened a deposition of the
witness in another action pending before the court for the pur-
pose of showing that he had testified therein to the effect that he
had never met appellant before that day, for the purpose of im-
peaching the witness, if erroneous, was without prejudice to
appellant, where a copy of the deposition was in the possession
of the appellant and he was permitted to call one of his attor-
neys, who testified that he was present at the taking of the

2. See 10 R. C. L. 937.

3. Contradicting witness by previous testimony, deposition, or
other writings, note, 82 Am. St. Rep. 46. See, also, 27 Cal. Jur. 156;
28 R. C. L. 633, 640. Proof by person who heard testimony of
admissions or contradictory statements by witness on former trial,
note, Ann. Cas. 1913B, 97. See, also, 28 R. C. L. 640. See 2 Cal.
Jur. 608; 2 R. C. L. 253.

deposition and heard the witness make the statement contained in the copy of the deposition.

[4] ID.—LACK OF KNOWLEDGE OF FRAUD—VALUABLE CONSIDERATION— DIRECTED VERDICT.—In such a case, where the evidence showed that the bank took the note sued upon free from any notice or knowledge of the fraud charged for a valuable consideration, it was entitled to enforce payment, and the court properly directed the jury to return a verdict in its favor.

(1) 8 C. J., p. 1047, n. 10.    (2) 8 C. J., p. 1031, n. 85.    (3) 4 C. J., p. 1010, n. 7.    (4) 8 C. J., p. 1060, n. 38.

APPEAL from a judgment of the Superior Court of San Bernardino County. Benjamin F. Warmer, Judge. Affirmed.

The facts are stated in the opinion of the court.

Henry G. Bockin, Harold L. Watt and M. O. Hert for Appellant.

Leonard, Surr & Hellyer for Respondent.

CURTIS, J.—On February 21, 1923, the appellant herein, S. J. Ulrey, executed and delivered to the Farmers and Merchants State Bank of Chino, California, a promissory note for the sum of $5,000, together with interest thereon at the rate of eight per cent per annum, payable six months after date. Thereafter, the note not having been paid at its maturity, the plaintiff, as superintendent of banks of this state and in charge and in control and in possession of the property and business of said bank in liquidation, instituted this action to recover the amount due on said promissory note. Appellant answered and admitted the execution of said note, but alleged that there was an entire want and absence of consideration for the execution thereof; that said note was delivered to Charles F. Carrere, C. J. Little, and the Farmers and Merchants State Bank of Chino, and that nothing of value was received by appellant except certain purported

4. Fraud in inception of negotiable instrument as prejudicing *bona fide* holder, note, 11 Am. St. Rep. 309. See, also, 3 R. C. L. 1007, 1070. *Bona fide* holder's right to recover on negotiable instrument, note, 26 Am. Dec. 156. See, also, 3 R. C. L. 997.

certificates of beneficial interests in the Dairy Loan Association to be converted into shares of the common stock of the Southwest Mortgage Company, a corporation; that said beneficial interests and said stock were worthless and that Carrere, Little, and the bank knew that they were worthless at the time of the execution and delivery of said note to said bank and that the worthless character of said beneficial interests and of said stock was unknown to appellant at the time he executed and delivered said note and at all times prior thereto. Appellant further alleged as a defense to said note that he was induced to execute and deliver the same through the false and fraudulent representations made by the said Carrere and Little to appellant as to the financial condition of the Southwest Mortgage Company and as to the value of its stock and also as to the financial standing and ability of the said Carrere and Little. Briefly stated, said representations which appellant alleges were made to him by said Carrere and Little and which were alleged to be false and fraudulent were that the Southwest Mortgage Company had been organized to take over the business of the Dairy Loan Association; that said Southwest Mortgage Company had earned an average profit of two per cent per month during the period of its existence on its preferred stock and that the earnings of said corporation were such that its common stock had an actual value of $50 per share; that if appellant would purchase certain certificates of beneficial interests in the Dairy Loan Association, to be thereafter converted into shares of the common stock of the Southwest Mortgage Company, and execute and deliver to Carrere and Little and the Farmers and Merchants State Bank a promissory note for $5,000 on account of the payment thereof, said Carrere and Little would resell said stock within six months from date so as to net appellant $75 per share, or upon their failure to do so, said Carrere and Little would themselves purchase said shares at said figure at the end of said period of six months; and that Carrere and Little were men of large means and well able to carry out said agreement with appellant. The answer further alleges that appellant relied upon said representations and was induced thereby to execute and deliver the promissory note sued on herein and that but for such reliance thereon he would not have executed nor delivered said note. Then

follows in the answer the necessary and proper allegations
that said representations were untrue and were false and
fraudulently made for the purpose of inducing appellant to
execute said promissory note, and, furthermore, that said
Carrere and Little had no intention at the time of making
said promises of performing the same. Finally, it is alleged
in appellant's answer that Carrere and Little in making said
false and fraudulent representations and promises were act-
ing in collusion with one J. S. Brown, who was during all of
said times the cashier and executive officer of said Farmers
and Merchants State Bank, and that said J. S. Brown as
cashier and executive officer had full knowledge of the false
and fraudulent character of said representations and prom-
ises, and with such knowledge, said Brown, on behalf of said
bank, accepted said note from appellant, and in accepting
said note was acting with the intent and purpose of assist-
ing in the perpetration of the fraud upon appellant, and
that by accepting said note, through its cashier and execu-
tive officer, said bank did so with full knowledge of the
fraud perpetrated upon appellant as set forth in said
answer.

Upon the issues made by said complaint and answer the
action went to trial before the court with a jury. The evi-
dence produced presented but slight if any conflict. In the
main it showed that Carrere and Little were stock salesmen.
The appellant some time previous to meeting either of said
men had become the owner of certain shares of capital stock
of the Leach-Biltwell Motor Company. Appellant's brother,
living in the northern part of the state, also was the owner
of stock in this corporation. The latter had some business
dealings with Carrere and had given to him a letter of in-
troduction to appellant in which he recommended Carrere
as an able salesman with whom he had considerable business
of a satisfactory nature and whom he considered, according
to appellant's testimony, was "the best man to help us dis-
pose of our Leach-Biltwell stock which we were desirous of
turning over." Carrere presented this letter of introduc-
tion to appellant at the latter's ranch near Chino, Cali-
fornia, about the middle of February, 1923, at which time
the two men talked over a possible sale or exchange of the
Leach-Biltwell stock owned by appellant and his brother.
Carrere represented to appellant that it would require a

considerable amount of capital to finance a campaign to sell the Leach-Biltwell stock owned by appellant and his brother; that he was forming a partnership with Little and that he had an opportunity to secure some beneficial interests in the Dairy Loan Association or stock in the Southwest Mortgage Company at a very low figure; that if appellant would take 200 of these beneficial interests in the Dairy Loan Association which in turn would be exchanged for 266⅔ shares of the capital stock of the Southwest Mortgage Company, the same would be turned over to appellant for $10,000 and 1,000 shares of his Leach-Biltwell stock. Carrere suggested appellant could go to his bank in Ontario and borrow the money upon his note. This appellant objected to doing for the reason, as stated by him, that it would prejudice his credit at his own bank. It was finally agreed after some days spent in consideration of the matter that appellant would investigate the stock of the Southwest Mortgage Company and if he became satisfied with its value he would endeavor to finance the project by negotiating a loan with the Farmers and Merchants State Bank at Chino. Accordingly, appellant met Carrere and Little at Ontario the next day and the latter then assured appellant that the common stock of the Southwest Mortgage Company was worth $50 per share and that they would resell any stock acquired by appellant in said company within six months from that date for $75 per share net to appellant. From Ontario the three men went to the Farmers and Merchants State Bank at Chino where they met J. S. Brown, the cashier of said bank. Appellant was introduced to Brown by Carrere or Little, as he had never met Brown before. He had never done any business with said bank prior thereto. After laying said matter before Brown, the latter agreed to make a loan of $5,000 to appellant, but stated the bank was not in a position "to handle the ten." The appellant, as a witness, testified regarding this meeting, as follows:

"Q. Just tell what was said and done at that time between the four of you. A. One of the boys, I think Mr. Carrere, suggested to Mr. Brown that I was ready to go ahead and close up the deal on the condition that they would handle my paper at the bank there and hold it there. Q. Did he say the amount of the paper? A. Yes—no, I

don't think the amount of the paper was mentioned at that time. I will get to that. He said I was ready to go ahead with the deal if they would handle my paper there at the bank and hold it there, and Mr. Brown in shaking hands suggested that he had never had the pleasure of my acquaintance, that he had heard of me, and if they handled my paper would I open an account with them or could I see fit to give them a part of my business, and I said I was tied up with the First National at Ontario at that time, but however I presumed that later I could open an account with them and give them a part of my business. Mr. Brown said they would be glad to handle $5000.00 of my paper, but they were not in a position at that time to handle the ten."

Either Carrere or Little suggested that they could get the other $5,000 in Los Angeles. Up to this time appellant had furnished no financial statement to the bank. He later furnished such a statement, which showed that his total assets were $255,425, with liabilities of $75,500. After some discussion relative to the probability of securing from Los Angeles a loan of $5,000, which, together with the $5,000 the Chino bank had agreed to furnish, would make up the necessary $10,000, the appellant asked to talk with Brown alone. Carrere and Little thereupon left the room and appellant asked Brown what he knew of Carrere and Little and of the Southwest Mortgage Company. Brown replied that he knew nothing of Carrere or of the Southwest Mortgage Company, but Little had come to him highly recommended and that he had had considerable business with him and found him reliable. Appellant desired more information regarding the two men and the mortgage company but stated to Brown that he did not feel competent to make the necessary investigation. Brown replied that he had had considerable experience along that line; that he had been in the banking business fifteen years and had handled a good many securities. At the request of appellant he agreed to assist appellant in determining the value of stock in the Southwest Mortgage Company and whether appellant would be justified in going into the deal. For this purpose they left for Los Angeles that afternoon. Before leaving they stated the object of their trip to Los Angeles to Carrere and Little and the latter suggested that they see a Mr. Johnson, trust officer in the Citizens Trust and Savings

Bank, and a Mr. Bennett, who was the president and manager of the Southwest Mortgage Company. On arriving in Los Angeles they went direct to Mr. Johnson, of the Citizens Trust and Savings Bank, and Mr. Brown introduced himself as the cashier of the Farmers and Merchants State Bank of Chino. He also introduced appellant. Appellant thereupon said: "Mr. Johnson, what we want to know is concerning the standing of the Southwest Mortgage Company and its management." To this statement Mr. Johnson replied, according to appellant's testimony, "Mr. Bennett was a man of splendid character and standing, that he had done business over Southern California for a number of years, that he was one of those kind of men that always paid his bills before they were due, always discounted his paper first he said, then he said that he always paid his bills before they were due. He said 'If he owes a bill to you the 2nd, 3rd, or 4th, he will be in the 1st,' and he only reorganized as I understand it the Imperial Dairy Loan to broaden its scope and give him a chance to increase its earnings, that they had been organized less than three months, had earned 1¾ per cent the first month, 2 per cent the second month, and so far during the third month, about two-thirds of it—in February, 1923—they were earning on the same basis. . . . Mr. Johnson said that he considered that the company had a splendid outlook with Mr. Bennett as manager, and suggested that we should interview Mr. Bennett, and we told him—I think I told him probably; one of us spoke up and said we had intended to interview Mr. Bennett." Appellant and Brown then went to Bennett's office, and, after Brown had introduced himself and appellant, the following took place, as shown by appellant's testimony: "I said, 'Mr. Bennett, I want to know what you know about these men Carrere and C. J. Little, what the standing of your company is and what it is doing and so on, or know concerning the Southwest Mortgage Company,' and Mr. Bennett told us the same, practically identically as Mr. Johnson concerning the reorganization of the Imperial Dairy Loan into the Southwest Mortgage Company so as to increase its scope. Its scope was not broad enough and didn't give them powers enough to handle the variety of paper to enable the company to earn what it should. Therefore they were reorganizing—well they had reorganized it but it was

still in transition as I understood it into the Southwest Mortgage Company; that they had earned the first month 1¾ per cent, the second month 2, and were earning on the same basis at that time; and I think this was in answer to a question probably, that they had 1350 shares of stock issued of the capital stock, $100.00 shares, [$100.00 per share] making the capitalization $135,000.00; that their assets were at that time between 160,000 and 165,000. In answer to the question as to Carrere and Little, Mr. Bennett told us they were not fly by nights, they had offices in the Pacific Mutual Building, they had fine offices there, that Mr. Carrere had been there quite a time, that he was worth probably a couple hundred thousand dollars, and Mr. Little was worth probably fifty thousand dollars, and that he considered them responsible and able to carry out any contracts they would enter into. I explained to him they had entered into a contract in writing to sell this stock, and he said he figured they were capable of any financial responsibility, and as to the Southwest Mortgage Company he said there was but little of this stock for sale. . . . Q. By the Court: Mr. Ulrey, did you ask Mr. Bennett how much stock was outstanding? A. I asked him concerning the stock and he answered as I said just now, that there were 1350 shares of the capital stock outstanding, but as to common stock I did not ask him the amount, nor was it stated in my presence anything concerning the amount. I had in mind necessarily what my knowledge had been at those times, that there was probably share for share. Q. But you made no personal inquiry? A. I made no personal inquiry. Q. By Mr. Bodkin: Did you know at that time there had been 50,000 shares of common stock issued? A. I did not know that until I had received my certificate later. . . . The Court: The question is did you tell Mr. Bennett that, that you were contemplating the purchase of common stock, as I understand the question. Mr. Bodkin: That is the question, yes. A. Well, I would say it would be my recollection that we did because of the answer which I do know that he stated that there was very little of this stock for sale, and that he, Carrere and Little owned it all, so he must have understood what stock. I cannot say we said 'common stock' because I say to you gentlemen of the jury and the Court what little experience I had had in stock I had noted that the common

stocks I had any acquaintance with usually fluctuated with the preferred stock. The main experience I had was with the Leach-Biltwell Company stock, which usually fluctuated one with the other. What I was going to say Mr. Bennett said, there were—going back to that stock proposition— Q. By Mr. Bodkin: Well was anything said about what the par value of the common stock was? A. Yes, we spoke of that; Mr. Bennett spoke of that. He said the common stock was no par stock, but that the earnings of the company would make it a nice stock to handle, but he said it was no par stock. Q. Was anything said at that time as to whether or not the stock had a book value? A. The book value according to my recollection was never mentioned there. . . . ''

After this meeting at Mr. Bennett's office appellant and Brown left for Ontario in the latter's automobile. Appellant's testimony as to what took place between him and Brown on the trip from Los Angeles to Ontario was as follows:

''Q. Did you have any conversation with Mr. Brown on the way home regarding the advisability of purchasing that stock? A. Yes, I said to Mr. Brown—I asked Mr. Brown what his impression was, what he thought of the stock and of the proposition, and he said it looked good to him. Q. At that time did you tell him whether you were going to purchase the stock or not? A. Yes; I told him that it looked good to me, and I thought I would go ahead with the deal.''

The next morning appellant, after calling up Carrere and Little on the telephone, met them at Ontario and the three then went to Chino and to the Farmers and Merchants State Bank, where they met Mr. Brown. The note sued on herein was prepared and signed by appellant and the latter wrote out an agreement, which was signed by Carrere and Little, whereby they agreed to resell the stock within six months and to turn the money into the bank. Two certificates, each for 100 beneficial interests in the Dairy Loan Association, were left with the bank for the purpose of exchanging them for common stock in the Southwest Mortgage Company. This was later done and said stock was held by the bank as security for appellant's note. As a part of the same transaction the bank issued to Carrere and Little two certificates of deposit, each for $2,500, payable six months after date. At this meeting Mr. Brown asked appellant for

a financial statement, and one was prepared and signed by appellant and contained the matters already referred to. At the same time appellant signed another note for $5,000 and delivered the same to Carrere and Little, which was subsequently transferred by them to a corporation in Los Angeles city. After the transaction was closed the appelland made frequent demands upon Carrere and Little to sell the stock as agreed, but they neither sold it nor any part of it nor would they purchase it from appellant. Prior to their maturity the two certificates of deposit issued by the bank to Carrere and Little had been transferred by them to third parties and the same were proven as legal claims against the bank, which in the meantime had suspended business and was in course of liquidation under the direction of the plaintiff, the superintendent of banks.

There is ample evidence in the record to sustain the allegations of the answer that the common stock of the Southwest Mortgage Company at the date when appellant acquired it was of little if any value. Mr. Bennett stated that he told appellant and Brown on the occasion of their visit to his office that the common stock had no value, but appellant and Brown both testified that they did not hear Bennett make any such statement. The evidence as to the financial ability of Carrere and Little at the time of their negotiations with appellant is not entirely satisfactory. It does appear, however, that they subsequently became involved in financial difficulties to such a degree that those who had had business dealings with them were compelled to resort to litigation, and that the proceedings against them were not confined on all occasions to civil side of the courts.

One of the grounds upon which the trial court directed the jury to return its verdict in favor of respondent was that there was no substantial evidence tending to prove that Brown, the cashier and executive officer of the bank, was a party to the fraud practiced upon appellant by Carrere and Little, nor that he had any knowledge of said fraud at or prior to the time appellant executed said promissory note. If the evidence was such as to justify the action of the trial court in directing a verdict in respondent's favor upon this ground, the judgment must stand, irrespective of the merits of any other ground upon which the court may have based its action. Appellant concedes that "there was

201 Cal.—30

no direct evidence of the culpability of the cashier of the bank acting on behalf of the bank,'' but contends that ''the circumstances shown were sufficient to have justified the jury in drawing the conclusion that the cashier was in fact a party to the scheme to rob the appellant.'' One of the circumstances which appellant contends as showing that Brown was a party to the fraud was that Brown, an experienced financier, having volunteered to assist appellant in investigating the value of the stock of the Southwest Mortgage Company, failed during such investigation to ascertain the assets and liabilities of the company or the amount of the preferred and common stock issued by it, and that had he ascertained these facts they would have shown that the common stock of the company was worthless. The failure of Brown to ask for a financial statement of the company showing its assets and liabilities, or to ascertain the amount of preferred and common stock issued by the company, would not necessarily show that he was a party to the scheme to defraud the appellant. It may not have occurred to him, as it appears it did not occur to the appellant, to ascertain these facts. It is true Brown was a banker of experience and appellant was a farmer who claimed to be unfamiliar with such matters, but appellant's financial statement made to the bank shows that he was possessed of property valued at over $250,000, among which were stocks and bonds owned by him in the following companies: ''F. M. Loan, Discount, Dussenberg Motors, Imperial Cotton Mills, Leach-Biltwell Motor Company.'' These stocks and bonds were valued by appellant in his statement at the sum of $37,600. To have acquired these stocks and bonds and thereafter to have managed the business necessarily connected with their ownership, appellant must have gained some familiarity with corporations and their manner of doing business. It is hardly probable that with the experience thus gained he had not himself learned of the importance of a financial statement in the affairs of a corporation or of the advisability of ascertaining the amount and character of its capital stock issued before investing therein. It may be conceded that there was a difference in the degree of knowledge possessed by these two men in this regard, but in our opinion the difference was not so great that an omission on the part of one would be naturally expected but on the part of the other

could be considered as an inference of fraud. Another circumstance which appellant claims indicated that Brown must have had a personal interest in the scheme with Carrere and Little was the fact that he had agreed to make the loan to appellant before receiving from him any statement showing the character, amount or value of appellant's property. While Brown had never met appellant before he was introduced to him by Carrere, he testified that he had heard of him, although there was evidence that he had stated in a deposition taken in another action that he had never heard of appellant before he was introduced to him by Carrere. The evidence showed that appellant resided upon his farm at Chino, consisting of 265 acres of land, and valued at over $100,000. We may take judicial notice of the fact that Chino is a farming district of limited area and only sparsely settled. It would have been unusual for a man in Brown's position in a community of the size of Chino not to have known something regarding a man of appellant's means and standing in that community. As a rule bank officials make it a part of their duty to inform themselves regarding the people of their community, and especially as to the extent and value of their property interest. It is not strange, therefore, much less a circumstance from which fraud could be inferred, that Brown, as cashier of the bank, was led to promise appellant a reasonable loan without first exacting of him a detailed statement of his property. Neither was the circumstance that Brown volunteered to go with appellant to Los Angeles and help him investigate the offer of Carrere and Little and spent the greater part of a day in making such investigation, without compensation or remuneration, indicative of any fraudulent interest of Brown in the scheme of Carrere and Little. When the subject of the loan was first broached to Brown by appellant the former based his assent thereto upon appellant transferring his business to the Farmers and Merchants State Bank at Chino, and, on ascertaining that appellant was tied up with the Bank of Ontario, he exacted a promise from appellant that he would at least divide his account between the two banks. It is apparent that Brown was looking after business for his bank, and if a trip to Los Angeles would secure appellant's patronage, it would not be an un-

reasonable service for him to gratuitously render in order to gain appellant's goodwill.

[1] While the evidence as recited herein is not all the evidence contained in the record, yet it comprises the main features thereof and has been stated as strongly in favor of appellant as the record warrants. We have, however, carefully read all the evidence to which our attention has been directed by appellant, and the greater part of the entire transcript, and we are of the opinion that the evidence taken as a whole was not sufficient to justify a jury in drawing an inference that Brown conspired with Carrere and Little to defraud appellant or that he had any knowledge of their unlawful scheme to defraud appellant of his property.

[2] Appellant assigns as error certain rulings made by the trial court in excluding evidence offered on his behalf. It appears that prior to the Ulrey transaction, in which, as we have already seen, the bank issued two certificates of deposit, each for $2,500, Brown, as cashier of the bank, had had other dealings with Little and one C. F. Wood, in which the bank had discounted two promissory notes for $400 and $800, respectively, and in payment thereof had issued certificates of deposit to Wood and Little. Thereupon appellant asked Brown the following question: "How many hundreds or thousands of dollars have you issued to Mr. Wood and Mr. Little prior to February 1, 1923?" To this question the respondent objected and his objection was sustained by the court and appellant assigns as error the action of the court in sustaining this objection. Appellant contends that the above question was proper and by it and other like questions he proposed to show that the bank "acting through its officers had issued certificates of deposit in payment of promissory notes received by the bank out of all proportion to the capitalization of the bank and not in conformity with good banking practices." Proof of such fact, appellant argues, would be a circumstance tending to show that the bank, through its officers, was in the conspiracy to defraud appellant. We confess our inability to see the force of appellant's argument. Conceding that the bank had pursued a method of doing business which was unsound, this fact would be no evidence whatever of any intention on the part of the officials to practice a fraud upon appellant or upon other persons occupying positions with reference to

the bank similar to that occupied by appellant. This contention, therefore, is without merit.

[3] While the witness Brown was on the stand he testified that he had heard of the appellant before he was introduced to him by Carrere. This testimony has already been referred to. For the purpose of impeaching him, appellant asked leave to open a deposition of Brown taken in another action pending before said trial court and which had not yet been tried. The attorneys for appellant represented the defendant in said action and expressly consented to the opening of said deposition. The attorneys for the plaintiffs in said action, however, were. not present and their consent was not and could not be obtained. Under these circumstances the trial court refused to permit the deposition to be opened. No authority is cited by appellant holding that this action of the trial court was erroneous, and in the absence of any such authority we would hesitate to rule that the trial court did not pursue the proper course. We are satisfied, however, that the appellant was not prejudiced by the refusal of the trial court to permit this deposition to be opened, for the reason that a copy of the deposition was in the possession of the appellant and he was permitted to call Mr. Watt, one of his attorneys, who testified that he was present at the taking of said deposition and heard Brown make the statement contained in the copy of the deposition to the effect that he had never met appellant before that day. Appellant was therefore permitted to impeach Brown by the testimony of a creditable witness, and if any error was committed in refusing permission to open the deposition, appellant was not prejudiced thereby.

[4] As we have already indicated, the evidence fails to show that Brown, the cashier of the bank, had any knowledge of the unlawful scheme of Carrere and Little. The bank, therefore, took appellant's note freed of any notice or knowledge of said fraud, and, having given a valuable consideration therefor, is entitled to enforce the payment thereof against appellant. The court's action, therefore, in directing the jury to return a verdict in respondent's favor, was proper and valid and the judgment based thereon should be sustained.

The judgment is affirmed.

Langdon, J., Preston, J., Shenk, J., Seawell, J., and Waste, C. J., concurred.